# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION ) | |
| ) | |
| DORIS ANNE COX, individually, and as ) | |
| Executor for the Estate of HAROLD E. ) | |
| COX, deceased, ) | |
| ) | Civil Action No. 19-548-MN-SRF |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CARRIER CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this asbestos litigation is the motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by defendant Foster Wheeler LLC ("Foster Wheeler"). (D.I. 120) For the following reasons, I recommend DENYING Foster Wheeler's motion for summary judgment.[1]

### II. BACKGROUND

#### a. Procedural History

On February 21, 2019, plaintiffs Harold Cox ("Mr. Cox") and Doris Anne Cox ("Plaintiff"), originally filed this personal injury action against multiple defendants in the Superior Court of Delaware, asserting claims arising from Mr. Cox's alleged harmful exposure to asbestos. (D.I. 1, Ex. 1) On March 21, 2019, Foster Wheeler removed the case to this court

---

[1] The briefing for the present motion is as follows: defendant's opening brief (D.I. 121), plaintiff's answering brief (D.I. 131), and defendant's reply brief (D.I. 134).

pursuant to 28 U.S.C. §§ 1442(a)(1), the federal officer removal statute,[2] and 1446. (D.I. 1) Mr. Cox passed away on October 8, 2019. (D.I. 60; D.I. 86 at ¶ 15) On May 13, 2020, Doris Anne Cox, individually and in her capacity as executor Mr. Cox's estate, filed an amended complaint reasserting claims arising from Mr. Cox's alleged harmful exposure to asbestos against several defendants, including Foster Wheeler. (D.I. 86) On September 2, 2020, Foster Wheeler filed the present motion for summary judgment. (D.I. 120)

### b. Facts

#### i. Mr. Cox's alleged exposure history

##### 1. Primary Exposures

Plaintiff alleges that Mr. Cox developed mesothelioma as a result of exposure to Foster Wheeler's asbestos-containing equipment and replacement boiler components during his service as a boiler tender in the United States Navy onboard the *USS Chukawan*. (D.I. 86 at ¶¶ 4–21) Accordingly, Plaintiff asserts claims for negligence, willful and wanton conduct, strict liability, loss of consortium, and wrongful death. (D.I. 86)

Mr. Cox served in the United States Navy from 1965 through 1968. (D.I. 131, Ex. A at 13:1–10) From January 1967 through October 1968, Mr. Cox was on active duty serving onboard the *USS Chukawan*. (*Id.* at 19:1–20) During the first year of his service onboard the *USS Chukawan*, Mr. Cox was an E-2 fireman, thereafter he was promoted to be an E-4 boiler tender. (*Id.* at 19:11–20:2)

---

[2] The federal officer removal statute permits removal of a state court action to federal court when, *inter alia*, such action is brought against "[t]he United States or an agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1).

Mr. Cox worked directly on the Foster Wheeler boilers onboard the *USS Chukawan*. (*Id.* at 22:8–23:2) Mr. Cox removed the doors from the Foster Wheeler boilers in the boiler room of the *USS Chukawan* four times during his service. (D.I. 131, Ex. B at 93:18–94:6) Mr. Cox removed the rope seal inside the Foster Wheeler boiler's doors twice. (*Id.* at 95:16–22) He used a knife to slice the rope out, which led to release of particles in the air. (D.I. 131, Ex. A at 26:3–12) Mr. Cox believed the rope contained asbestos. (*Id.* at 25:23–27:5) Mr. Cox cleaned gaskets on the boiler door using a scraper, a process that filled the air with asbestos particles. (*Id.* at 27:7–23) Mr. Cox also replaced the gaskets using a hammer, another process that led to particles filling the air. (*Id.* at 28:3–23)

On twelve different occasions, Mr. Cox cleaned out fire tubes[3] inside one of the Foster Wheeler boilers onboard the *USS Chukawan*. (D.I. 131, Ex. B at 89:2–10) This work involved using a six- or seven-inch scraper to remove "carbon-like stuff" and dust. (D.I. 131, Ex. A at 22:8–23:10) Mr. Cox believed this contained asbestos based on what he had heard other people say and based on the fact that fuel was being burned. (D.I. 131, Ex. B at 91:25–92:16) There were roughly fifteen fire tubes in the *USS Chukawan's* boiler room; each one was eight feet tall. (D.I. 131, Ex. A at 24:4–10) Scraping these fire tubes took two twelve-hour days. (*Id.* at 24:21–25:3) After doing this work, the sailors would cough up "black stuff" for about ten days. (*Id.*)

### 2. Secondary Exposures

Mr. Cox spent about 12 hours per day in the boiler room during his service onboard the *USS Chukawan*. (D.I. 131, Ex. A at 49:6–15) Mr. Cox conducted morning checks that took about four hours, during which he stood on a second level catwalk directly above four boilers

---

[3] Plaintiff refers to this process as "[p]unching tubes," and counsel referred to "punching the tubes" during the deposition of Captain William Lowell, Plaintiff's expert. (D.I. 131 at 5, Ex. D at 80:6–15)

3

that were manufactured by Foster Wheeler located in each of the four corners of the boiler room. (*Id.* at 20:7–22) From the catwalk, Mr. Cox could see workers on the first floor below him scaping out fire tubes and replacing gaskets around the boiler doors. (*Id.* at 22:8–21) Particles generated by the work being conducted on the first floor rose with the heat to the second level while Mr. Cox was on the second-floor catwalk. (*Id.* at 30:9–23) This work occurred "all the time." (*Id.* at 30:9–23) After conducting his checks on the second level, Mr. Cox proceeded to the fourth floor of the boiler room to help clean the fire room for four hours. (D.I. 131, Ex. B at 79:23–80:21) The particles generated by the work continuing on the first floor reached Mr. Cox while he was on the fourth floor and made breathing more difficult. (D.I. 131, Ex. A at 31:2–32:3) Every five days Mr. Cox returned to the first floor of the boiler room to clean; he would sweep the floors with a large broom, which created dust in the air. (*Id.* at 46:23–48:4)

**ii. Plaintiff's product identification evidence relevant to Foster Wheeler**

Mr. Cox was deposed on April 10, 2019. (D.I. 12) Mr. Cox testified that Foster Wheeler had manufactured the four boilers in the boiler room of the *USS Chukawan* during his service onboard. (D.I. 131, Ex. A at 21:25–22:2) Mr. Cox knew that Foster Wheeler had manufactured the boilers onboard because he saw the Foster Wheeler name on each boiler. (D.I. 131, Ex. B at 86:12–87:3) Plaintiff retained Captain William Lowell ("Captain Lowell") as an expert witness in this case.[4] (D.I. 110) Captain Lowell testified at a deposition on January 23, 2020, and prepared an expert report dated September 24, 2019. (D.I. 57; D.I. 110) At his deposition, Captain Lowell confirmed that, during Mr. Cox's service onboard the *USS Chukawan*, four Foster Wheeler boilers would have been present. (D.I. 131, Ex. D at 26:18–21) He testified that

---

[4] The parties stipulated and the court so ordered that Captain Lowell's report dated September 24, 2019, and the transcript of his deposition conducted on January 23, 2020, are admissible for the purposes of product identification and nexus summary judgment motions despite his death on or about February 16, 2020. (D.I. 110)

4

punching tubes would result in gaskets and padding being disturbed inside the boilers, taking the pad off of the steam drum manhole, and changing the gasket out on the manhole. (D.I. 131, Ex. D at 80:6–15) Captain Lowell also testified that, from 1964 until 1980, Foster Wheeler boilers used asbestos-containing gaskets. (*Id.* at 85:9–87:24)

## III. LEGAL STANDARD

### a. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex*, 477 U.S. at 322. The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial, and the court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989); *Scott v. Harris*, 550 U.S. 372, 380 (2007). An assertion of whether or not a fact is genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not

5

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" rather, there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue. *See Anderson*, 477 U.S. at 247-49 (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex*, 477 U.S. at 322. If the non-movant fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, then the movant is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322–23.

If a party fails to address another party's assertion of fact, the court may consider the fact undisputed, or grant summary judgment if the facts show that the movant is entitled to it. Fed. R. Civ. P. 56(e)(2)–(3).

### b. Maritime Law: Substantial Factor Causation

The parties do not dispute that maritime law applies to all substantive issues in this litigation. (D.I. 104) In order to establish causation in an asbestos claim under maritime law, a plaintiff must show, for each defendant, "that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor[5] in causing the injury he suffered." *Lindstrom v. A-C*

---

[5] "Maritime law incorporates traditional 'substantial factor' causation principles, and courts often look to the Restatement (Second) of Torts for a more helpful definition." *Delatte v. A.W. Chesterton Co.*, 2011 WL 11439126, at *1 n.1 (E.D. Pa. Feb. 28, 2011). The comments to the Restatement indicate that the word "substantial," in this context, "denote[s] the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard

6

*Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 375 (6th Cir. 2001)); *Dumas v. ABB Grp., Inc.*, 2015 WL 5766460, at *8 (D. Del. Sept. 30, 2015), *report and recommendation adopted*, 2016 WL 310724 (D. Del. Jan. 26, 2016); *Mitchell v. Atwood & Morrill Co.*, 2016 WL 4522172, at *3 (D. Del. Aug. 29, 2016), *report and recommendation adopted*, 2016 WL 5122668 (D. Del. Sept. 19, 2016); *Denbow v. Air & Liquid Sys. Corp.*, 2017 WL 1199732, at *4 (D. Del. Mar. 30, 2017), *report and recommendation adopted*, 2017 WL 1427247 (D. Del. Apr. 19, 2017).

"In establishing causation, a plaintiff may rely upon direct evidence (such as testimony of the plaintiff or Decedent who experienced the exposure, co-worker testimony, or eye-witness testimony) or circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time."[6] *Abbay v. Armstrong Int'l, Inc.*, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012) (citing *Stark*, 21 F. App'x at 376). On the other hand, "'[m]inimal exposure' to a defendant's product is insufficient [to establish causation]. Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Lindstrom*, 424 F.3d at 492 (quoting *Stark*, 21 F. App'x at 376) (internal citation omitted). "Rather, the plaintiff must show 'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Abbay*, 2012 WL 975837, at *1 n.1 (quoting *Lindstrom*, 424 F.3d at 492). "Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict product[] liability." *Stark*, 21 F. App'x at 376 (citations omitted).

---

it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility." Restatement (Second) of Torts § 431 cmt. a (1965).

[6] However, "'substantial exposure is necessary to draw an inference from circumstantial evidence that the exposure was a *substantial* factor in causing the injury.'" *Stark*, 21 F. App'x at 376 (emphasis in original) (quoting *Harbour v. Armstrong World Indus., Inc.*, 1991 WL 65201, at *4 (6th Cir. Apr. 25, 1991)).

7

### c. The Duty to Warn

In *Devries*, the Supreme Court rejected "the more defendant-friendly bare-metal defense," which provided that "[i]f a manufacturer did not itself make, sell, or distribute the part or incorporate the part into the product, the manufacturer is not liable for harm caused by the integrated product . . . ." *Air & Liquid Systems Corp. v. Devries*, 139 S. Ct. 986, 993 (2019). The Supreme Court held that a product manufacturer has a duty to warn in the context of maritime tort law "when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger." *Id.* at 987, 995–96.

### d. Government Contractor Defense

A federal contractor will not be held liable for its product's design defects when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). The defense is applicable to both design defect and failure to warn claims. *See, e.g., MacQueen v. Union Carbide Corp.*, C.A. No. 13-831-SLR-CJB, 2013 WL 6571808, at *3 (D. Del. Dec. 13, 2013), *report and recommendation adopted*, 2014 WL 108535 (D. Del. Jan. 9, 2014); *Walkup v. Air & Liquid Sys. Corp.*, C.A. No. 12-1635-SLR-SRF, 2013 WL 5448623, at *2 (D. Del. Sept. 26, 2013), *report and recommendation adopted*, 2013 WL 5798701 (D. Del. Oct. 24, 2013); *In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d 451, 454 (D. Del. 2009). In a failure to warn claim, the first prong of *Boyle* is altered to preclude liability where the government exercised discretion and approved the warnings. *See Tate v. Boeing*

*Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995). Courts require the government approval to "transcend rubber stamping" for the defense to shield a government contractor from liability for failure to warn. *Id.* at 1156–57.

## IV. DISCUSSION

### a. Substantial Factor Causation

The court recommends denying Foster Wheeler's motion for summary judgment because there is a genuine issue of material fact in dispute as to whether Mr. Cox's exposure to asbestos attributable to the Foster Wheeler boilers and their asbestos-containing replacement components was a substantial factor in causing his injuries, as required by maritime law. *See Lindstrom*, 424 F.3d at 492. Foster Wheeler argues that the court should grant its motion because "[n]o evidence of frequent or regular exposure to any asbestos-containing products associated with Foster Wheeler boilers exists" in the record. (D.I. 121 at 12; *see also* D.I. 134 at 2–4) However, Foster Wheeler's argument ignores the evidence in the record of Mr. Cox's total exposure inclusive of secondary exposures. (D.I. 131, Ex. A at 30:9–32:2)

As Foster Wheeler notes, evidence in the record suggests that Mr. Cox worked directly on the Foster Wheeler boilers onboard the *USS Chukawan* as follows: on twelve different occasions, he scraped out the fire tubes inside a boiler, which took two twelve-hour days each time; he removed doors on the boilers to access fire tubes therein four times; and, during two of those removal processes, he replaced the rope or gasket that sealed the boiler doors. (*See* D.I. 134 at 2 (citing D.I. 132, Ex. B at 93:21–24, 95:20–22)[7]; D.I. 131, Ex. A at 23:7–25:14, Ex. B at

---

[7] Foster Wheeler's reply brief cites Plaintiff's brief in opposition to another defendant's motion for summary judgment. (*See, e.g.*, D.I. 134 at 1 n. 1 (citing D.I. 132)) However, Foster Wheeler appears to have intended to reference Plaintiff's brief in opposition to Foster Wheeler's motion as the pages actually cited do not appear in Plaintiff's brief in opposition to the other, now mooted motion for summary judgment. (*Cf.* D.I. 131, Ex. B at 93:21–24, 95:20; D.I. 132, Ex. B)

9

89:2–92:10) Others also performed this same work "all the time," including when Mr. Cox conducted "checks" on the second-level catwalk in the boiler room and when he was on the fourth floor cleaning. (D.I. 131, Ex. A at 30:15–18) For at least twenty-one months,[8] Mr. Cox spent twelve hours per day in the *USS Chukawan's* boiler room. (*Id.* at 18:19–19:14, 49:10–15) Every day he spent four hours on the second-level catwalk doing "checks" and another four hours cleaning on the fourth floor. (D.I. 131, Ex. A at 30:15–32:2, Ex. B at 79:23–80:21) Both areas were both "[o]pen" to the boilers below. (D.I. 131, Ex. A at 20:24–21:3) As a result, particles from the work going on below rose to him and impacted his breathing. (D.I. 131, Ex. A at 20:24–21:3, 30:15–32:2, Ex. B at 79:23–80:21) Mr. Cox spent the final four hours of his day sweeping and cleaning the first floor of the boiler room, which also created dust that he breathed. (D.I. 131, Ex. A at 46:23–47:25, Ex. B at 79:23–80:21) Mr. Cox testified that the rope or gasket and the fire tubes that he and others worked on contained asbestos. (D.I. 131, Ex. A at 26:18–27:5, Ex. B at 91:25–92:10) Thus, the record contains evidence of the "frequency, regularity, or proximity" of Mr. Cox's work on and around Foster Wheeler boilers sufficient to create a genuine issue of material fact regarding substantial factor causation. *See Janis v. A.W. Chesterton, Inc.*, C.A. No. 17-167-MN-SRF, 2019 WL 264890, at *5 (D. Del. Jan. 18, 2019), *report and recommendation adopted*, 2019 WL 442283 (D. Del. Feb. 4, 2019) (quoting *Thomasson v. Air & Liquid Sys. Corp.*, 2015 WL 1639730, at *4 (D.N.J. Apr. 9, 2015)). Further,

---

[8] Plaintiff avers that Mr. Cox spent 21 months onboard the *USS Chukawan*, during which he was exposed to Foster Wheeler boilers every day. (D.I. 131 at 9–10) Foster Wheeler argues that Plaintiff's calculation of Mr. Cox's exposure is incorrect because it ignores the period from January 1968 through May 1968, when the *USS Chukawan* was being repaired. (D.I. 134, at 2 n.1) Mr. Cox testified at his deposition that he was onboard the *USS Chukawan* for "[a]bout 21 months in all." (D.I. 131, Ex. at 19:1–20) He also testified that the *USS Chukawan* was in a shipyard from January 1968 through May 1968 after a collision with another ship necessitated repairs. (D.I. 121, Ex. B at 113:17–114:25) Mr. Cox testified that the boilers onboard were not running during that time. (*Id.* at 114:16–18)

10

the evidence showing Mr. Cox's direct work on Foster Wheeler pumps and his presence in the boiler room and proximity to those boilers while others did the same work amounts to "a high enough level of exposure" such "that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *See Lindstrom*, 424 F.3d at 492 (internal citations and quotations omitted).

Foster Wheeler makes two other arguments in support of its motion for summary judgment on the issue of causation. First, Foster Wheeler argues that the fire tubes Mr. Cox worked on did not contain asbestos. (D.I. 134 at 2) Mr. Cox testified, however, that he thought the black material he removed from the fire tubes contained asbestos. (D.I. 131, Ex. B at 91:25–92:10) Foster Wheeler's argument amounts to a factual dispute (*Cf.* D.I. 121, Ex. C at ¶¶ 11(j); D.I. 131, Ex. B at 91:25–92:10), which the court may not resolve against Plaintiff at this stage. *See Matsushita*, 475 U.S. at 587. Second, Foster Wheeler argues that Plaintiff impermissibly relies upon expert testimony to create an issue of fact. (D.I. 134 at 3) However, as shown above, and unlike the cases Foster Wheeler cites, Mr. Cox's testimony creates a genuine issue of fact as to substantial factor causation without reliance on expert testimony. *Cf. Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 855 (9th Cir. 2019) (affirming district court's grant of summary judgment in an asbestos case where the plaintiff "provide[d] the only potential evidence of exposure" and "relied on the testimony of two experts" to establish causation because "[a] party's own speculation is insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness") (internal citations omitted); *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1174–76 (9th Cir. 2016) (noting that the plaintiff's evidence was "not especially strong" where the plaintiff's case was based on "the first-hand observations of two lay witnesses and, based on these

observations, the opinion of one purported expert" and concluding that "[s]uch evidence . . . create[d] a genuine issue of fact regarding" the plaintiff's exposure to asbestos). Therefore, the court recommends denying Foster Wheeler's motion for summary judgment.

### b. Duty to Warn Under *Devries*

Foster Wheeler argues that Plaintiff's claims related to an alleged failure to warn about the dangers of third-party replacement parts fail because the record lacks evidence required to successfully bring such a claim under *Devries*. (D.I. 121 at 12–16; D.I. 134 at 4–8) Although Plaintiff notes that Foster Wheeler likely supplied replacement parts for the boilers that Mr. Cox worked on, Plaintiff argues that Foster Wheeler had a duty to warn about the dangers associated with third-party replacement parts under *Devries*. (D.I. 131 at 10–12)

#### i. The "Required Test"

Under *Devries*, manufacturers have a duty to warn "only when their product *requires* a part in order for the integrated product to function as intended." *Devries*, 139 S. Ct. at 995 (emphasis in original). The Supreme Court noted some specific circumstances in which the requirement rule would apply, namely, "when: (i) a manufacturer directs that the part be incorporated; (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part." *Id.* at 995–96 (internal citations omitted). The Court limited the applicability of these circumstances, however, to situations where "the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and the manufacturer has no reason to believe that the product's users will realize that danger." *Id.* at 996. Foster Wheeler refers to these situations as "prongs" of the *Devries* "required test." (D.I. 121 at 14–15) Using Foster Wheeler's convention, the "required test" announced in *Devries* is disjunctive and non-

12

exhaustive. *See Devries*, 139 S. Ct. at 995–96. Accordingly, any one of the circumstances listed will satisfy the test. *See id.*; *In re Asbestos Products Liab. Litig.*, 2021 WL 2828524, at *2–4 (E.D. Pa. July 7, 2021) (applying the three prongs of the requirements test).

Foster Wheeler argues that no evidence in the record exists as to any of the situations in which the Supreme Court held would satisfy *Devries'* requirement rule. (D.I. 121 at 14–15) More specifically, Foster Wheeler argues that the record shows that: (1) it did not direct the use of asbestos-containing replacement parts from a third-party for the boilers onboard the *USS Chukawan*; (2) it did not make the boilers at issue knowing that asbestos-containing replacement parts would be required as evidenced by the existence of asbestos-free alternatives; and (3) evidence shows that the boilers at issue would continue to function without asbestos-containing parts. (*Id.*)

The evidence in the record creates an issue of material fact as to whether Foster Wheeler required the use of asbestos-containing replacement parts for its boilers onboard ships like the *USS Chukawan*. Plaintiff cites a Foster Wheeler "Instruction Book" for "Marine Steam Generators" to show its boilers required asbestos-containing replacement parts.[9] (D.I. 146, Ex. F[10]) Although the "Instruction Book" states that the Foster Wheeler boiler insulation "should be thoroughly examined and replaced with asbestos rope of approved size where necessary, and asbestos cement as specified," the book relates to commercial ships, not the *USS Chukawan* or similar Naval ships. (*Id.* at 35) Foster Wheeler argues (D.I. 134 at 4–5 n.2), and the court

---

[9] Plaintiff's answering brief cites to Exhibits F and G. (*See, e.g.*, D.I. 131 at 10 n.68, 11 n.72) However, no such exhibits were attached to the brief. (*See id.*) The court brought this issue to counsel's attention during the oral argument held on December 10, 2020, and Plaintiff supplemented the briefing by filing the missing exhibits, which the court relies upon here, on December 11, 2020. (D.I. 146, Exs. F & G)

[10] Exhibit F to D.I. 146 does not have page numbers. The court cites to this exhibit according to the page numbers indicated on the ECF system.

13

agrees, that this evidence is immaterial because it relates to commercial ships, not the *USS Chukawan* or a ship of the same class. *See Penn Mut. Life Ins. Co. v. Bank of New England Corp.*, 756 F. Supp. 856, 857 (E.D. Pa. 1991) ("A dispute as to an immaterial fact cannot preclude an entry of summary judgment."). Plaintiff also cites an affidavit, in which a former Foster Wheeler employee, Mr. Walter Newitts, stated that "in approximately the late 1950's, asbestos containing calcium silicate was specified by Foster Wheeler for use on every boiler." (D.I. 131, Ex. E at ¶ 10) Foster Wheeler argues this evidence is also immaterial as it relates to "powerhouses," not Naval applications. (D.I. 134 at 4 n.2; *see* D.I. 131, Ex. E at ¶¶ 5, 10) Although Mr. Walter Newitts mentioned that he "would visit the construction sites of various powerhouses" as part of his job, his statement that Foster Wheeler specified asbestos-containing parts encompassed "every boiler" and was not expressly limited to powerhouse applications. (D.I. 131, Ex. E at ¶ 10); *cf. In re Asbestos Products Liab. Litig.*, 2021 WL 2828524, at *3 (E.D. Pa. July 7, 2021) (on remand from the Supreme Court in *DeVries*, the court concluded that the plaintiffs had failed to meet the first prong of the requirements test despite the fact that they produced evidence showing that defendants specified asbestos insulation for incorporation into land-based turbines because the turbines at issue were maritime turbines).

By contrast, Foster Wheeler's expert's affidavit states that the Navy decided whether to use asbestos-containing third-party replacement products on the relevant boilers based on its own "MilSpecs" from "pre-qualified third-parties" based on lists "created, maintained, and regularly updated by the Navy, not from the original Naval equipment supplier." (D.I. 121, Ex. E at ¶ 59) Foster Wheeler's argument and its expert's statement relate to who exercised discretion about whether to use asbestos-containing replacement parts, not whether Foster Wheeler required such replacement parts. Regardless, whether the Navy or Foster Wheeler exercised such discretion is

14

a disputed fact as Captain Lowell's expert report states that Foster Wheeler was "involved in the design and the development of military specifications for their equipment, as well as the use and incorporation of asbestos-containing products for use on and with their equipment." (D.I. 131, Ex. C at 4–5)[11]

### ii. Whether Foster Wheeler knew or had reason to know that its product would likely be dangerous for its intended uses

Foster Wheeler argues that under *Devries*, "Plaintiff must show that Foster Wheeler knew (or reasonably should have known) that a sailor's contact with asbestos-containing third-party products in the normal course of operating or repairing Foster Wheeler's equipment was, itself, a hazardous operation." (D.I. 121 at 15) Further, Foster Wheeler argues that Plaintiff fails to meet such a standard because its own evidence establishes that both the Navy and Foster Wheeler believed "that the use of asbestos-containing gaskets with shipboard equipment did *not* pose a risk of harm to those handling such equipment." (*Id.* at 16 (citing[12] D.I. 121, Ex. H at ¶ 69, Ex. M))

Under *Devries*, "a manufacturer [has] a duty to warn when its product *requires* incorporation of a part and the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses." *Devries*, 135 S. Ct. at 993–94 (emphasis

---

[11] The issue of who exercised discretion is an issue discussed *infra* with respect to the government contractor defense. For Forster Wheeler to successfully avail itself of the government contactor defense based on the discretion prong of the *Boyle* test, it would be required to show that the Navy's approval of warnings went beyond "rubber stamping" Foster Wheeler's choice of warnings. *MacQueen v. Union Carbide Corp.*, 2013 WL 6571808, at *9 (D. Del. Dec. 13, 2013), *report and recommendation adopted*, 2014 WL 108535 (D. Del. Jan. 9, 2014).

[12] Foster Wheeler's citation to Exhibits H and M are inaccurate. As Foster Wheeler cites elsewhere in its brief (D.I. 121 at 10), the "Forman Report" is found at Exhibit I, not Exhibit H. (D.I. 121, Ex. I) Foster Wheeler also cites Exhibit M as the "Riblett Memo." (D.I. 121 at 16) However, Exhibit M is a document titled, "Industrial Health Engineering," written by Allen D. Brandt. (D.I. 121, Ex. M)

15

in original). "When a manufacturer knows (1) that asbestos dust is dangerous; (2) that an integrated product, used as intended, requires periodic replacement of an asbestos-containing part; and (3) that the replacement process will expose users to asbestos dust, the manufacturer has reason to know the integrated product is likely to be dangerous for its intended uses." *Hammell v. Air & Liquid Sys. Corp.*, 2020 WL 5107478, at *6–7 (D.N.J. Aug. 31, 2020) (denying summary judgment where the evidence showed that the defendants "knew or should have known by the time their products were furnished to the Navy that exposure to asbestos dust could cause asbestosis or lunch cancer" and that "their products, when used as intended, required replacement of asbestos-containing gaskets" and that "removing and replacing asbestos-containing gaskets could expose a user to asbestos dust"). As in *Hammell*, there is a dispute of material fact as to whether Foster Wheeler knew or should have known that their integrated products were likely dangerous for their intended uses. *See id.* The record suggests that Foster Wheeler had actual knowledge of the dangers of asbestos exposure as early as 1968, and may have had constructive knowledge even earlier. (D.I. 131, Ex. E at ¶¶ 15–17, Ex. G at 142–44) The record also suggests that using the Foster Wheeler boilers as intended would have necessitated regular removal and replacement of gaskets and packing material. (D.I. 121, Ex. D at 98:6–99:3) Finally, the record shows that Foster Wheeler knew or should have known that doing gasket work on their boilers would expose workers to asbestos dust. (D.I. 131, Ex. E at ¶¶ 14, 21, 27–28) However, evidence also suggests that the prevailing view at the time was that gaskets and packing material were negligible sources for possible harmful asbestos exposure. (D.I. 121, Ex. I at ¶ 69) Accordingly, a dispute of material facts exists over the second element of the *Devries* test. *See Hammell*, 2020 WL 5107478, at *6–7.

### iii. Whether Foster Wheeler had no reason to believe that users would realize the danger of using its products

Foster Wheeler argues that "Plaintiff must finally prove that Foster Wheeler had no reason to believe that the Navy would realize the hazard, if any, of using asbestos-containing third-party products with Navy equipment." (D.I. 134 at 7) Foster Wheeler argues that the record fails to meet such a standard because the Navy had a safety program in place related to asbestos before Mr. Cox's service onboard the *USS Chukawan*. (D.I. 121 at 16) As Plaintiff notes, Foster Wheeler's argument attempts to rewrite the *Devries* standard by noting the Navy's ability to warn of the dangers relevant to Mr. Cox's exposures. (D.I. 131 at 12) The third prong of the *Devries* test imposes a duty to warn on a manufacturer when "the manufacturer has no reason to believe that the product's users will realize that" its "integrated product is likely to be dangerous for its intended uses." *Devries*, 135 S. Ct. at 996. Foster Wheeler concedes that, throughout Mr. Cox's time in the Navy, the Navy did not believe the use of asbestos-containing gaskets and packing with shipboard equipment posed a risk of harm to shipyard employees. (D.I. 121 at 10 (citing[13] D.I. 121 Ex. O at 1, Ex. I at ¶¶ 113–20)); *see Hammell*, 2020 WL 5107478, at *7 ("This alone is sufficient to create a genuine dispute of material fact because the Navy was not aware of the dangers of asbestos-containing gaskets in environments such as the shipyard where [the plaintiff's decedent] worked and Defendants had reason to know the Navy would not realize the dangers posed by their products when in shipyards."). As in *Hammell*, a material issue of fact exists concerning the third prong of the Supreme Court's test for determining the duty to warn under *Devries*.

---

[13] Foster Wheeler's citation to Exhibit O is inaccurate. Foster Wheeler cites Exhibit O as the "Riblett Memo," dated December 9, 1968. (D.I. 121 at 10) However, the document at Exhibit O is a document titled, "Department of the Navy Safety Precautions for Shore Activities," dated April 1965. (D.I. 121, Ex. O)

17

The court recommends denying Foster Wheeler's motion for summary judgment on Plaintiff's failure to warn claims because, considering the evidence in the light most favorable to Plaintiff, Foster Wheeler has failed to establish that Plaintiff cannot succeed on her failure to warn claims as a matter of law. *See Matsushita*, 475 U.S. at 587; *Hammell*, 2020 WL 5107478, at *7.

### c. Government Contractor Defense

The government contractor defense shields defendants from liability for acts arising out of the performance of a federal contract. *See Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 797 (5th Cir. 1993). A federal contractor is not liable for failure to warn when:

> (1) the United States exercised its discretion and approved the warnings, if any;
> (2) the contractor provided warnings that conformed to the approved warnings; and
> (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

*See Hicks v. Boeing Co.*, C.A. No. 13-393-SLR-SRF, 2014 WL 1051748, at *5 (D. Del. Mar. 17, 2014), *report and recommendation adopted*, 2014 WL 1391104 (D. Del. Apr. 8, 2014) (quoting *MacQueen v. Union Carbide Corp.*, C.A. No. 13-831-SLR-CJB, 2013 WL 6571808, at *4 (D. Del. Dec. 13, 2013), *report and recommendation adopted*, 2014 WL 108535 (D. Del. Jan. 9, 2014)).

Foster Wheeler points to Military Specifications ("MilSpecs"), an Affidavit from Rear Admiral John B. Padgett, III (Ret.), the declaration of Foster Wheeler corporate representative, J. Thomas Schroppe, the deposition of Plaintiff's expert, Captain Lowell, and other exhibits as evidence that the government was intimately involved in the design and manufacture of all products and warning labels affiliated with the same that were used on Navy warships. (D.I. 121 at 4–7, 16–20) Rear Admiral Padgett states:

> Naval equipment suppliers, such as Foster Wheeler, had no independent authority or ability to dictate or control the work of uniformed Navy sailors or civilian Naval

shipyard personnel during the relevant time period. Similarly, based on my knowledge and experience, absent express direction and approval by the Navy, Foster Wheeler was not expected to provide, and could not have provided, verbal or written asbestos-related warnings to Navy sailors or Naval shipyard personnel or employees working in or on commissioned Navy ships. Simply stated, the Navy's detailed specifications did not leave room for individual contractors or equipment suppliers to make independent determinations about the inclusion of asbestos-related warnings.

(*Id.*, Ex. E at ¶ 80) Mr. Schroppe confirmed that Foster Wheeler complied with the Navy's specifications. (*Id.*, Ex. C at ¶¶ 5–6) However, Plaintiff's expert Captain Lowell states in his expert report:

> Vendors or suppliers of asbestos-containing equipment to the Navy, including, but not limited to . . . Foster Wheeler . . . were involved in the design and the development of military specifications for their equipment, as well as the use and incorporation of asbestos-containing products for use on and with their equipment. Military specifications were not unilaterally dictated by the Navy to the equipment manufacturers; rather, military specifications were arrived at after consideration, input, expertise, and advice from their equipment manufacturers. In addition as between the Navy and equipment manufacturers, the manufacturers had the highest level of expertise in the operation and maintenance of their equipment they designed, manufactured and sold to the Navy. The Navy regularly sought expertise and advice from equipment manufacturers on the safe and efficient operation of the equipment manufactured and sold to the Navy by those suppliers.

(D.I. 131, Ex. C at 4–5) A question of fact exists as to whether the Navy would not have allowed warning labels on the equipment in issue, or whether it required manufacturers to warn of hazards with such equipment. Consequently, genuine issues of material fact remain with respect to the first two elements of the *Boyle* analysis: (1) whether the government exercised discretion and approved of warnings, if any, and (2) whether the contractor provided warnings. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512–13 (1988); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995). In light of these disputes of fact, the court need not reach the third prong. Therefore, the court recommends denying Foster Wheeler's motion for summary judgment based on the government contractor defense. *See, e.g., Evans v. Alfa Laval, Inc.*, C.A. No. 2017 WL 3736686, at *7 (D. Del. Aug. 30, 2017), *report and recommendation adopted*, 2017 WL

4278588 (D. Del. Sept. 26, 2017) (denying summary judgment based on the government contractor defense under similar factual circumstances); *Esser v. CBS Corp.*, C.A. No. 15-395-GMS-SRF, 2017 WL 3592451, at *7 (D. Del. Aug. 21, 2017) (same).

## V. CONCLUSION

For the foregoing reasons, the court recommends DENYING Foster Wheeler's motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: July 16, 2021

Sherry R. Fallon
United States Magistrate Judge